SIMEON N. FREEMAN, APPELLANT, vs. HENRY TIMANUS, APPELLEE.

1. Where a bill is taken *pro confesso*, and a final decree is passed under the statute, an appeal lies to this court under the practice in this State, and in all cases such an appeal opens for the consideration of this court the record prior to the default.

2. Where A, claiming possession of real estate, institutes a possessory action at law against B, who is in possession under an agreement between them, which if set up in the action at law is a good defense, a court of equity will not enjoin the proceedings, but leave the party to make his defense at law.

3. A court of equity will not entertain a bill where the plaintiff in possession seeks to enforce a merely legal title to land, without any supervening equity.

4. Where there is no equity in the bill, or the case made shows a plain remedy at law, this court, in an appeal of this character, should direct the bill to be dismissed, though these questions are not raised in the pleadings.

SUPPLEMENTARY HEAD NOTES.—RANDALL, C. J.

1. Orders made in the progress of a cause should appear in the record; and the Supreme Court, on appeal, cannot presume that an order, no evidence of which appears in the record, was made by the circuit court.

2. The principle that "the jurisdiction of any court exercising authority over a subject may be inquired into in every other court, when the proceedings of the former are relied upon and brought before the latter by the party claiming the benefit of such proceedings," is a rule of evidence, and is not in the nature of appellate or supervisory power.

Appeal from a decision of the Circuit Court sitting for Nassau county.
37

Statement of the case, prepared by Chief-Justice Randall :

A bill was filed by Henry Timanus, complainant, appellee, against the appellant in the circuit court of Nassau county, in which complainant alleges that he is the owner in fee simple of certain lands and tenements in the city of Fernandina, known as lots numbers one, two, seven, and eight, in block thirty-six, having purchased the same from the Trustees of the Florida Railroad Company on the 19th day of January, 1860 ; that ever since his said purchase he has been the *bona fide* and absolute owner, and as such now holds possession thereof; that the defendant claims to have an interest in the premises by reason of a purchase of said premises "under a certain confiscation sale had by and under a decree rendered in the United States District Court in and for the Northern District of Florida, in the month of ———, 186-, and also by reason of a certain tax sale had on the 13th day of February, 1865, by the Direct Tax Commissioners of Florida, under an act of Congress, being an act for the collection of direct taxes in insurrectionary districts within the United States."

That the said confiscation sale referred to was illegal and void in this : that complainant was not a party to the proceedings ; was never notified or summoned to appear ; that no jury had been empanelled to try the issue, and that said confiscation could not be had without complainant first being tried and convicted of treason ; that no indictment or trial was had in said United States court against him; "that the said confiscation referred to is a gross fraud, and altogether illegal and void under the Constitution and laws of the land, and defendant was a privy in and to said fraudulent and illegal proceedings, and therefore did not and could not obtain any title or interest in said premises which would entitle him to the possession thereof." That at the time the pretended confiscation took place in the United States District Court there existed a civil war between the United States and the late Confederate States of America, of which

Florida was a part, "by reason whereof the civil jurisdiction of the United States within this State was suspended and inoperative, and the decree of said court confiscating the lands of complainant was absolutely void."

The bill further charges that the tax sale of said premises by the Tax Commissioners on the 13th February, 1865, was also a fraud against him, and that the proceedings thereunto had by the said Direct Tax Commissioners were altogether illegal, because of the existence of the civil war between the government of the United States and the late Confederate States, and the authority of the United States government to enforce its revenue laws at that time was suspended and inoperative, and the sale was illegal and void; that at the time the United States Tax Commissioners assessed and levied the direct tax of the United States on said premises, and sold the same for said taxes, the civil authorities of the United States were not established in Florida, nor in Nassau county, and that the military authority of the United States was not fully established through said State or county, or through any county in the State, and the acts therefore of the tax commissioners in assessing, levying, and selling the premises were against the provisions of the direct tax laws, and therefore absolutely void and of no effect.

That the tax levied upon said premises under said act of Congress was otherwise unconstitutional and unlawful, because the direct tax upon the State of Florida levied by the commissioners was not in proportion to the census of the several States, but much higher in Florida; and besides, fifty per cent. was added over and above the actual proportion levied on said State, by reason whereof said sale was void. That there was no legal assessment, the pretended assessment being made by only two of the Board of Tax Commissioners, which was not authorized by law, " and in consequence of which said assessment, together with the sale made thereon in June, 1863, was afterwards set aside by the Board of Direct Tax Commissioners under and by the direction and advice of the government of the United

States." That complainant had no notice of any assessment or levy of said tax, and no legal notice of the sale of said premises as he should have had under the law, and that the sale was not had in pursuance of any legal notice whatever. "That there was a great fraud perpetrated upon complainant by defendant, the tax commissioners, and other bidders at the said tax sale, in this, that there was a connivance between them to undersell the premises of complainant, contrary to law and against the morals of our community." That the property was assessed at $1,650, and sold for less than two-thirds of its appraised value, to wit, for $40 only, which was contrary to law. That the entire direct tax, inclusive of costs, &c., charged against his property in Fernandina, was $161, which was levied on all his lots, (which included a large number of other lots,) and on the sale previously had by the commissioners on the 27th and 28th of December, 1864, and the 2d and 5th of January, 1865, of other lots than the premises in question, the sum of $525 had been obtained, which was more than enough to pay the entire tax charged against his property, and the sale of these premises, therefore, was absolutely void. That the money obtained by the commissioners from the sale of his property was never paid into the Treasury of the United States, greatly in fraud of the government as well as the complainant. That said lots one, two, seven, and eight, in block thirty-six, were sold together, whereas they should have been sold separately as required by law. That the acts of the tax commissioners in apportioning the tax, the levy, the order of sale, and advertisement were all had in the city of Washington instead of in Florida, which were against the express provisions of the statutes; and finally, the act under which said property was sold is otherwise in conflict with the fundamental law of the land, and the proceedings under said act were otherwise irregular, illegal, and fraudulent, all which was well known to said defendant at the time of both said sales, the confiscation-sale and the tax sale. That the defendant at the time of the tax sale was in possession of the premises under the

confiscation title, and was therefore bound to pay said direct taxes charged, and his buying in the property at said tax sale, and thereby obtaining a tax title, was illegal and fraudulent, and his tax title worthless.

That on the third day of November, 1865, complainant and defendant entered into an agreement and understanding, that complainant should occupy the house and premises in controversy, subject to the legal rights and interests which either of said parties may have in and to said premises, to be determined by the courts of the land; viz., that on or about that time several former owners of lots in Fernandina which had been sold by the said Direct Tax Commissioners under the act of Congress referred to, among whom complainant was one, had commenced or were about to commence proceedings against other tax purchasers in other cases, to test and try the validity of said sales, and it was then and there understood and agreed upon that said complainant and the defendant should wait and abide the final decision of the courts as to the validity or avoidance of the tax sales in Fernandina, and in the event that the final decisions should be in favor of the tax purchaser, that complainant was to pay defendant a reasonable rent, to be determined after the final decisions by and between complainant and defendant, and under this agreement and understanding the complainant has ever since occupied said premises, awaiting the final decisions of said courts in those cases already commenced and pending, at the time of filing this bill, before the United States Circuit Court for the Northern District of Florida.

And the complainant charges that the defendant, in disregard of his agreement, on the 31st of July, 1867, demanded payment of six hundred dollars of rent, or the delivery to defendant of the premises, and threatened, in case of refusal to pay or deliver possession, "to invoke the aid of the proper authorities in the matter," and on complainant refusing to comply with such demand, the defendant, on the 5th day of August, 1867, made complaint against him, as his tenant, before W. H. Johnson, a justice

of the peace, for the unlawful withholding against his consent the possession of said premises, and thereby obtained an order from said justice against complainant to forthwith remove from said premises, or to show cause why such possession should not be delivered up to said defendant, all which actings and doings are contrary to the express understanding and in violation of the agreement by and between them, and contrary to equity and good conscience, &c.

The bill prays " that both the sales of complainant's property may be declared void; that the defendant's title in said premises based upon said fraudulent and void sales may be set aside, and also be declared void," and also prays a temporary injunction against said defendant to stay all the proceedings in law already commenced before said justice of the peace, and to enjoin him and them from all acts of interference with complainant's said property and the possession thereof, and from transferring and disposing of his said confiscation title and the said tax. sale certificate, and upon the final hearing, a perpetual injunction.

The bill was filed on the 12th August, 1867. On the 27th September, an answer was filed, which was signed by defendant's attorney, but not sworn to.

The following indorsement, without date, appears on said answer: "Ruled out, as not being entered, filed subsequent to the order of the court, or properly sworn to. Th. T. Long." The answer being thus disposed of, on the 28th day of January, 1868, a final decree *pro confesso* was made, to the effect following: "The Court being fully advised in the premises, do find that the plaintiff has title and is the owner of the lots numbers 1, 2, 7, and 8, in block number thirty-six, in the city of Fernandina, and that both the confiscation sales of the plaintiff's said property to the defendant heretofore had by and under a decree of confiscation rendered in the United States District Court for the Northern District of Florida, and the tax sale of the plaintiff's property on the 13th day of February, 1865, by the United States Direct Tax Commissioners of Florida, to

said defendant, were all and singular void, and that the law and equity in the premises are all in favor of the plaintiff."

" It is further ordered, adjudged, and decreed, that defendant's title set up and claimed in and to plaintiff's said premises by reason of said confiscation and tax sale, are hereby declared void, and of no binding force; and it is further ordered and decreed that henceforth the defendant, his servants, attorneys, his agents, and his heirs and assigns be perpetually enjoined and forever forbidden to proceed in the proceedings at law heretofore commenced."

The defendant was present at the rendition of this decree and excepted to it.

An appeal is now prosecuted to this court by the defendant, and the grounds upon which a reversal of the decree is prayed are as follows:

That the court could not obtain jurisdiction in the matter by enjoining the proceedings of the court below, that had and was exercising jurisdiction of the matter in controversy, in accordance with the laws of the State.

That portion of the decree of the court relating to the title of property was erroneous, for the reason (as will appear from the evidence of the plaintiff) that plaintiff was the tenant of defendant, and could not, therefore, dispute the title of his said landlord.

The court erred in deciding that there was no answer on file, on the ground that the jurat to the answer on file was defective; complainant objecting to said answer only in that particular.

The court erred in subsequently ruling that there was no answer in, after granting thirty days in which to amend or file answer, said answer originally filed having been sworn to anew and filed by defendant within said thirty days.

The court erred in refusing defendant permission to amend the jurat to his answer so as to conform to the rules and practice of the court.

The court erred in decreeing on the title to the property in-

volved, when the original suit which the court was prayed to enjoin was only for possession.

The court erred in granting a decree as confessed, and permitting complainant to proceed *ex parte* to a final decree.

The court erred in making a decree which virtually annuls and sets aside a former decree of the United States District Court for the Northern District of Florida, and also a certificate of sale from the United States Direct Tax Commissioner.

*Bolling Baker* and *R. M. Smith* for Appellants.

*J. P. Sanderson* for Appellee, submitted in brief.

1. Exception is to the court below taking jurisdiction of the case.

It is the province of a court of chancery to stay proceedings at law and take jurisdiction, when there are equities existing between the parties which can not be made available at law.

The equities in this case grow out of the contract set up in the bill, explained by the averments of its purpose and meaning as construed by the parties.

The principle is fully established, that the jurisdiction of any court exercising authority over a subject, may be inquired into in every other where the proceedings of the former are relied on and brought before the latter. Elliot vs. Piersol, 1 Peters, 340; 3 How., 750. This case approves and affirms the case in 1 Peters, 340.

2d Exception has no application to this case. The facts upon which the exception is based do not exist, and are not presented by the record.

3d Exception. The answer filed was the answer of an attorney at law, and not of the defendant. This is not admissible. The plaintiff is entitled to answer of defendant, and in this case the answer filed was no answer; it was not even sworn to by the attorney who filed it. Read vs. Consequa, 4 Wash., C. C., 174. The filing of an answer after decree *pro confesso* is no

ground for moving to set it aside. 1 Dan. Ch., Ed. 1865, p. 505, 745—note. There was no jurat, no answer on file, hence nothing to amend. Answer had been stricken out. 1 Dan. Ch., Ed. 1865, 747, note 1; ibid. 745, note 2, and ibid. 503, notes.

4th Exception. The facts as shown by the record sustain the ruling of the court. The answer having been stricken from the file in the cause and not refiled, there was no such paper in court; but even the jurat of defendant to his attorney's answer was made thirty days after the time had expired within which defendant had leave to file his answer. The record does not show that any further application was made for leave to file answer or open decree *pro confesso* which had been taken at rule day in November, while the jurat of defendant was made to the attorney's answer in December.

5th Exception can not be considered as having any force. The record does not show that any application was ever made to the court for any such purpose, and if there had been, the court could not have allowed it. 1 Dan. Ch., Ed. 1865, 505, 506, note 1.

The decree was regularly taken at rule day in November, at the time prescribed by the rules. No application, as appears of record, made to vacate or set aside the decree *pro confesso*, it was made absolute. The court had no alternative. Ch., Rule 18, and Thomp. Dig., 457.

On an appeal from a final decree, based on a decree *pro confesso*, the party in default is estopped from all inquiry into the proceedings subsequent to the default. Only that which has been done prior to the decree *pro confesso* is open to examination before the appellate court. Betton vs. Williams, 4 Fla., 11 and 15; Megin. vs. Filor, ibid., 107.

By the default, all the allegations properly made in the bill are confessed, and the allegations thus admitted are sufficient to sustain the decree.

Exceptions 6 and 8 are taken to proceedings subsequent to the decree *pro confesso*, and are not open to examination. If they

were, there is no error presented by either of them. The titles are set up in the bill under which both parties claim, and brought before the court, and there is nothing upon the pleadings that show they were not rightfully there.

7th Exception. The record contradicts the assumed fact on which the exception relies for error. The record shows, and counsel admits, that he was present at the final hearing, and prayed an appeal in open court. The facts not existing, the exception falls.

8th Exception. There is no force in this exception. The bill alleges that, in the case of confiscation, there was no service on appellee, and that he had no notice of the institution of the suit or proceedings in the U. S. Court; that he never appeared or had his day in court; and the authority in 1 Peters, above cited, is ample to cover this exception.

The record does not contain sufficient to enable this court to pronounce such a decree as the court below ought to have done, should it proceed to do so, or to determine whether the court below erred. Are the evidences of title-deeds, or contract, or other evidence so placed on the record as to authorize this court to regard them?

The rule of this court prescribes what is necessary to be done. Each document offered in evidence on the trial, must bear the evidence of having been read on the trial, as prescribed by the rule, or the court will not consider them; and it is not the fault of the appellee if they are not, nor can such defects operate to his prejudice. When they are wanting, the plain duty of this court is to affirm the decree.

The same rule applies here as in a case at law. The party excepting must at law, at his peril, place so much in his bill of exceptions as shows the court did err to his prejudice. Proctor vs. Hart, 5 Fla., 468.

To apply this principle to a chancery cause, the appellant must, at his peril, see that his record contains all that is essential to enable this court to ascertain the errors of the court below, if

any, and the facts necessary to enable the appellate tribunal to correct them.

There is nothing in this record to enable this court to ascertain and correct any errors, if any exist, and the decree should, therefore, be affirmed.                               J. P. SANDERSON,
                                                    Att'y for Appellee.

WESTCOTT, J., delivered the opinion of the court:

This is an appeal in Chancery entered after a final decree based upon an order taking the bill for confessed in the court below. The statute of 1853 allowing appeals from interlocutory orders does not change the rule laid down in this court in the case of Betton vs. Williams, 4 Fla., 14, as it expressly provides that an appeal entered after final decree shall bring up the interlocutory orders for review, and that the postponement shall not be held as an acquiescence. It was held by this court in the case mentioned that such an appeal could only bring before this court the proceedings in the cause anterior to the default upon which the order taking the bill for confessed was based, and it is only to that extent that we open the record in this case. There is, however, this distinction between this case and the case of Betton vs. Williams. In the last case, after the demurrer was overruled, the case was abandoned, and there was no appearance at the hearing or exception to the final decree. It passed by default. Here there was no abandonment, but appearance at the hearing and exception to the final decree. 25 Wend., 250.

It is true that the proceedings are ex parte after the entry of the order that the bill be taken *pro confesso*, but the decree under the statute is required to be such as is "proper," and consequent from the matter of the bill, and in making which there is necessarily the exercise of a judicial judgment, the plaintiff not being allowed to take such decree as he can abide by. 2 Smith's Ch'y Practice, 24; Thomp. Dig., 457.

It is unnecessary in determining this case to say whether the appearance at the hearing and exception to the final decree modifies the rule announced in the case of Betton vs. Williams, nor do we express any opinion upon that subject, or upon the regularity or propriety of the interlocutory order in this case striking out the answer.

The appeal in this case bringing before this court the record prior to the default, the bill is open for our inspection, and if upon the face of the bill there is no equity, or there is a plain and adequate remedy at law, the case must be remanded with directions conformable to that view. It may be urged that no such objection being made in the pleadings or presented in the decree of the Chancellor, this court cannot consider them. Such, however, is the practice of appellate tribunals in England, and such is the practice in the Supreme Court of the United States. 1 Phil., 399; 12 Ired., 231; 19 Howard, 278; 8 B. Mon., 137.

The rule should certainly prevail in cases of this character. The case as stated by the bill is briefly as follows : Each party, plaintiff and defendant, claim title to certain real estate. There are suits pending in the courts of the United States which it is thought involve the questions upon which their respective rights depend. The plaintiff in actual possession, and who claims both possession and property, and the defendant not in actual possession, but who claims the right of possession as well as property, make an agreement that plaintiff shall retain possession without prejudice until the matter is determined by the United States Circuit Court in the cases pending in that court, and if the questions are determined against him he agrees to pay a reasonable rent, to be determined by the parties after the decision of the circuit court. It is alleged that in violation of this agreement the defendant, before these questions are decided by the circuit court, claiming that the relation of landlord and tenant exists between them, institutes his action in a magistrate's court to recover possession upon the de-

fault of his tenant (which he alleges plaintiff to be) in the payment of rent which he states is due, whereupon this bill is filed. It describes the title of the plaintiff, as well as the title of the defendant, sets out the agreement for possession in the plaintiff as above described, and its violation by defendant, and prays that defendant's title be set aside, and for a perpetual injunction against the defendant, his heirs, and assigns, restraining them from ever setting up any title or claim in the property.

Upon the case made by the bill, plaintiff's remedy in the possessory action is to show for cause the agreement under which he is in possession, and taking the case as he states it, it is a plain and adequate remedy at law.    Thomp. Dig., 398.

Without determining any question connected with the decree of the District Court of the United States, or the tax sale, it is evident that under this agreement as described in the bill, plaintiff has no more right to come into a court of equity to settle the question of title, than has defendant to seek a court of law to establish his asserted right of possession.    They have agreed to abide the decision of another tribunal.    The agreement as stated in the bill is not that defendant shall remain in possession permanently without a payment of rent, but that he shall remain in possession until the cases are determined by the circuit court, and in the event the decision is against him he shall pay such rent as is then agreed upon.    If the decision should be against him, and he should make default in payment of the rent agreed to be paid, a right to institute the possessory action would accrue to defendant.    While this is the agreement, the prayer of the bill is for a perpetual injunction.

We must assume that the agreement mentioned in the bill is executed so as to be available at law to meet the possessory action.    This being so, the parties should be left as they have placed themselves by their agreement, which prohibits this court from settling the question of title, as well as the magistrates' court from adjudicating the question of possession.

The facts claimed as constituting the equities in this bill are

based principally upon the agreement which it sets up, and that agreement, if it is as described, is a good defense at law to the possessory action, which does not involve the title.

An injunction to stay proceedings at law is not granted where the injury complained of is plainly remediable by the court of law, as in this case. Story's Eq., § 875; Mit. Eq. Pldg., 127, 128, 131.

We cannot view the case as one in which the agreement has been rendered inoperative by the act of · the parties, among other reasons, because the plaintiff claims the benefit of it in his bill. But if it could be so viewed it leaves the bare question of title, and a court of equity will not entertain a bill where the plaintiff in possession seeks to enforce a merely legal title to land without any supervening equity. 19 How., 278; 2 Sch. and Lef., 209, 210; 2 Bro. P. C., 39; 44 Barb., 167.

That there was no jurisdiction in the court of the United States, or that there was no personal service in the proceeding against the property when sold under the decree of confiscation (which are the allegations in the bill), are not supervening or extraneous equities which will enable a complainant in possession to settle in a State *court of equity an admitted question of title* between himself and the purchaser at the confiscation sale. Besides, should it be conceded that a State court of equity could under these circumstances settle the question of title, it certainly acts too hastily and without due consideration when, in the absence of a transcript of the record of the decree or judgment of the court of the United States, it proceeds to adjudge it, as well as the proceedings under it, void. Such matter, in the language of the statute, is not "proper to be decreed," without at least a transcript of the record, and courts of the State, as well as the courts of the United States, should be well satisfied that they do not exceed their powers, and that they act upon sufficient evidence, when they deal with the judgments and decrees of each other.

In this case no parties but the plaintiff and defendant are

concerned in the question, and there is no pretence for avoiding a multiplicity of suits within the meaning of the authorities upon that subject.   19 How., 279 ; 2 Sch. and Lef., 210.

The bill should have been dismissed at the hearing.

It is ordered, adjudged, and decreed that the decree in this cause is reversed and set aside, and that the cause be remanded to the court below with directions to take such further proceedings therein as are conformable to the views expressed herein and the principles of equity.

RANDALL, C. J.

Concurring with the opinion of the court in the disposition of this case, I desire to add the following suggestions, which are deemed pertinent to the character of the case and the nature of the proceedings had before the Chancellor.

The record in this case is in a very confused and almost unintelligible condition.   The rulings and orders of the Chancellor in relation to the answer which the defendant attempted to put in, are vague, and indeed, the indorsement which appears on the back of the answer itself, is the only order in the record preceding the final decree in respect to it, although the decree *pro confesso*, signed by the complainant's solicitors, recites that the defendant is " still in default to answer," having failed to answer "in compliance of law and the order of this honorable court."   I am therefore unable to discover that the court, prior to the final hearing and decree, did actually strike out the answer to which the defendant had annexed his affidavit, on the 7th day of December, 1867, or that it was adjudged by the court to be insufficient, or not in compliance with the supposed order requiring the said answer to be sworn to.   The record should show that the answer was struck off by the *court*.   I know of no rule giving the solicitors the power to adjudicate upon the sufficiency of an adversary's pleading.   But in view of the final determination of the case, it is unnecessary to take any order relating to these proceedings.

The bill alleges that the defendant " claims to have an interest in the premises by reason of a purchase under a certain confiscation sale, had by and under a decree rendered in the United States District Court," and also by reason of a certain tax sale, had on the 13th February, 1865, by the U. S. Direct Tax Commissioners, under a certain act of Congress, for the collection of direct taxes in the insurrectionary States, and alleges that said confiscation sale, and the tax sale, were irregular, not made in conformity to law, are void and fraudulent, and the acts of Congress aforesaid were unconstitutional, inoperative, and void. As to the said direct tax sale, the bill does not show that the defendant claims to hold any tax certificate or tax deed of said premises, but it alleges that such tax sale, and another tax sale of said premises, made in June, 1863, had been " set aside by the Board of Tax Commissioners, under and by direction of the Government of the United States." By the complainant's own showing, then, the defendant's " claim" under the tax sale is not a color or cloud of title, but a mere empty pretext, which would not be regarded by any court, and cannot be made a source of serious annoyance to the complainant, or against which he is entitled to invoke the aid of a court of equity to obtain relief, as his remedy at law is unquestionable, plain, and adequate; indeed, the prayer that said tax sale be set aside, would seem to be superfluous, the government of the United States and the Tax Commissioners having already set it aside and annulled it, according to the averment in the bill of complaint.

The bill prays that the said confiscation sale may be declared void, and that the defendant's title thereunder be set aside and declared void, and that the defendant be enjoined from asserting any interest in said premises thereunder, &c. The complainant (appellee) insists that " the principle is well established, that the jurisdiction of any court exercising authority over a subject, may be inquired into in every other court, when the proceedings of the former are relied on and *brought before the latter by*

*the party claiming the benefit of such proceedings."* This is unquestionably true. Whenever a party introduces the proceedings or judgment of one court before another court, it can have no weight or force, if the court whose proceedings are so sought to be used, had no jurisdiction; and its record may be examined to ascertain its authority and jurisdiction; yet this right to question the jurisdiction is not in the nature of appellate or supervisory power, but a *rule of evidence.*

In this case the complainant, by his bill, seeks to examine, review, and set aside the judgment and decree of the District Court of the United States, and to cancel and destroy the effect and power of such decree; in other words, the circuit court of this State is invoked to assume the character of an appellate tribunal, to decide whether the proceedings of the U. S. District Court are regular and according to law, and to reverse or annul such judgment or decree of the federal court. This is not the first time that such an experiment has been attempted. The lessons of history, too fresh in the memory of all, should have dispelled the notion of the supremacy of the States and State courts over the proceedings of the judicial tribunals of the United States, acting under and in the enforcement of the laws of the United States. The government of the Union has provided high tribunals, and invested them with full power and authority to examine and correct all errors committed by its inferior courts, and to keep them within their appropriate limits. The decisions of the appellate judicial tribunal of the federal government, upon questions arising under acts of Congress, are final, conclusive, and binding upon the judicial and political agents alike of the general and State governments; and in the event that the inferior courts of the United States transcend their authority and jurisdiction, the appellate power of the Supreme Court affords a plain, adequate remedy.

But it may be said that the writ of injunction sought, is in no sense a prohibition *to the court* in the exercise of its jurisdiction; that it is not addressed to the court, and does not affect to in-

terfere with it; that the process is directed only to the party; that it does not assume superiority over the federal court in which the proceedings were had, or attempt to control its proper jurisdiction. Unfortunately, however, the remedy sought here is to prevent the execution of the judgment of the District Court. An execution is the "*fructus, finis, et effectus legis.*" The execution stayed or prohibited, destroys the effect of the judgment itself, and renders it of no value. Cases may occur, perhaps, where, by reason of the transactions of parties to a judgment rendered in the U. S. Court, the party may be enjoined by a State court from enjoying the fruits of the judgment. But this is not such a case.

In Duncan vs. Darst *et al.*, 1 How., 301–8, the court say: "The general rule is, (5 Watts R., 144, and nothing is better settled,) that an officer is not justified in obeying the order of a judge, or court, having no jurisdiction in the matter; and this rule applies in an especial manner, as between the State and federal courts, where it never has been supposed that the judges of the one could control the process of the other. If it was otherwise, and writs of injunction, of supersedeas, and orders to discharge defendants from imprisonment, could be granted by State courts, or judges, to render ineffectual process issued from the courts of the United States, the jurisdiction of the latter might be, and probably would be, overthrown in parts of the Union; as it would be the exercise of the power of *prohibition*, and might be extended to defeat the fruits of all judgments rendered by federal courts and judges. A conflict of jurisdiction fraught with more dangerous consequences could not well be supposed." In the same case the court remarks: "As State courts or magistrates cannot be compelled to aid a federal court in the exercise of its jurisdiction, so neither can they be permitted to restrain its process by injunction or otherwise, as was held in McKim vs. Voorhies." 7 Cranch, 279. The same was held in English *et al.* vs. Miller *et al.*, 2 Rich. Eq. R., 320. The complainants filed a bill praying an injunction to restrain the

collection of an execution issued upon a judgment recovered in the U. S. Circuit Court for South Carolina. The Chancellor says: "If the complainants had any peculiar equitable ground of relief against the judgment, their application should have been made on the equity side of the court which rendered the judgment. This court has certainly no authority to enjoin the proceedings of the federal court." On appeal to the Court of Appeals in equity, the decree of the circuit court was affirmed.

In the cases of Ableman vs. Booth, and United States vs. Booth, 21 Howard, 506, in which a District Court of the United States, having convicted and sentenced the defendant, Booth, to imprisonment under a statute of the United States, the Supreme Court of a State discharged the defendant from impris-onment under the writ of *habeas corpus*, on the ground that, in the opinion of the State court, the act of Congress under which he was convicted was unconstitutional and void, the Supreme Court of the United States say: "The supremacy of State courts over the courts of the United States, in cases arising un-der the Constitution and laws of the United States, is now for the first time asserted and acted upon in the Supreme Court of a State. The supremacy is not, indeed, set forth distinctly and broadly, in so many words, in the printed opinions of the judges. It is intermixed with elaborate discussions of different provis-ions of the fugitive slave law, and of the privileges of the writ of *habeas corpus*. But the paramount power of the State court lies at the foundation of these decisions; for their commentaries upon the provisions of that law, and upon the privileges and power of the writ of *habeas corpus*, were out of place, and their judicial action upon them without authority of law, unless they had the power to revise and control the proceedings in the criminal case of which they were speaking; and their judgment, releasing the prisoner, can rest upon no other foundation." "If the judicial power exercised in this instance has been reserved to the States, no offense against the laws of the United States can be punished by their own courts, without the permission and

according to the judgment of the courts of the State in which the party happens to be imprisoned; for, if the Supreme Court of the State possessed the power it has exercised in relation to offenses against the act of Congress in question, it necessarily follows that they must have the same judicial authority in relation to any other law of the United States; and consequently, their supervising and controlling power would embrace the whole criminal code of the United States, and extend to offenses against the revenue laws or any other law intended to guard the different departments of the general government from fraud or violence. And, moreover, if the power is possessed by the Supreme Court of one State, it must equally belong to every other State in the Union, when the prisoner is within its territorial limits; and it is very certain that the State Courts would not always agree in opinion; and it would often happen, that an act which was admitted to be an offense, and justly punished in one State, would be regarded as innocent, and indeed praiseworthy, in another.

"No State can authorize one of its judges or courts to exercise judicial power within the jurisdiction of another and independent government. The powers of the general government, and of the State, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties, acting separately and independently of each other within their respective spheres; and the sphere of action appropriated to the United States is as far beyond the reach of the judicial process issued by a State judge or court as if the line of division was traced by landmarks and monuments visible to the eye.

"The Constitution contemplated that in the sphere of action assigned to the Federal Government, it should be supreme, and strong enough to execute its own laws by its own tribunals without interruption from a State or from State authorities. And it was evident that anything short of this would be inadequate to the main objects for which the Government was established.

"The judicial power (of the United States) was justly regarded as indispensable, not merely to maintain the supremacy of the laws of the United States, but to guard the States from any encroachment upon their reserved rights by the Federal Government. And as the Constitution is the fundamental and supreme law, if it appears that an act of Congress is not pursuant to and within the limits of the power assigned to that Government, it is the duty of the courts of the United States to declare it unconstitutional and void."

The court says further: "If the authority of a State, in the form of judicial process or otherwise, should attempt to control the marshal or other authorized officer or agent of the United States in any respect, it would be his duty to resist it and call to his aid any force that might be necessary to maintain the authority of law against illegal interference. No judicial process, whatever form it may assume, can have any lawful authority outside the limits of the jurisdiction of the court or judge by whom it is issued; and an attempt to enforce it beyond these boundaries is nothing more than lawless violence."

Now, in the case at bar, the court of the State is invoked to issue its injunction to prevent a citizen from obtaining benefits that have been accorded to him under the operation of a judgment of a court of the United States; and the State court has proceeded to adjudge unlawful and void an apparent right acquired in pursuance of such judgment on the ground that the Federal court had exceeded its judicial power, and has issued its injunction "forbidding and restraining the defendant from ever setting up any title or claim by reason of said confiscation sale."

The judgment and decree of the circuit court, therefore, is nothing more nor less than an attempted exercise of a *quasi* appellate jurisdiction, bringing in review and annulling the judicial proceedings of a tribunal having exclusive jurisdiction of the subject matter, and threatening a party with the pains and penalties of disobedience and contempt, if he shall at-

tempt to enjoy the fruits of the judgment of the Federal court. I conceive that the circuit court had no power to award the "relief" prayed for, and that its proceedings tend to bring on a conflict between the State and Federal authorities, if either should proceed to enforce its decree.

It is further alleged by the complainant in his bill that the defendant was in possession of the premises in question prior to the third of November, 1865, under his said pretended titles. Instead, however, of commencing his action at law to recover such possession, and establishing his own superior title, (in which action the defendant, by setting up and claiming his rights growing out of the confiscation sale and the tax sales, would have subjected his evidences of title to inquiry and adjudication, upon the principle that "the jurisdiction of any court exercising authority over a subject may be inquired into in every other court when the proceedings of the former are relied on and brought before the latter *by the party claiming* the benefit of such proceedings,") he entered into an agreement with the defendant whereby he obtained possession of the premises subject to the legal rights of the parties, *to be determined by the courts,* and the respective parties agreed to await and abide by the adjudication of the courts in cases already commenced or about to be commenced, and engaged that in the event that the final decision of the courts should be in favor of the tax purchasers, the complainant was to pay the defendant a reasonable rent, to be determined after such final decisions by and between the parties; and that this complainant has ever since occupied said premises, awaiting the final decision of said courts in cases already commenced and pending before the United States Circuit Court; and says that the defendant, disregarding said agreement in July, 1867, demanded payment of six hundred dollars of rent or the possession of the premises, and threatened to invoke the aid of the proper authorities in case the complainant should refuse to comply with the demand; and that the defendant had commenced a proceeding against him

before a justice of the peace for the purpose of removing complainant from said premises, all which actings and doings are alleged to be " contrary to the express understanding, and in violation of said agreement, and contrary to equity and good conscience."

I have no doubt that under this state of facts the proceedings before the justice of the peace would have been dismissed whenever such facts should appear. This agreement estops the defendant from taking any such measures to obtain possession. His right of possession, as well as his claim for rent, depends upon the adjudication of questions affecting the title and interests of the respective parties in the premises, according to the terms of the agreement as set forth in the bill.

It is claimed that the complainant, by reason of the violation of the agreement in instituting such proceedings before the justice of the peace on the part of the defendant, had a right to abandon and treat the contract as. rescinded, and having the advantage of possession under the agreement, to file this bill to secure himself from the annoyance of the suit before the justice, and to cancel all the defendant's pretended evidences of title; and he may say that he is not in a condition to bring an action of ejectment because he is already in full possession. But if he chooses to abandon the agreement, and resort to measures not contemplated by it, because the defendant has not kept it, he must not take any such advantages of the agreement himself as is given by his being in possession under it. If he abandons and rescinds it in one respect he must abandon it altogether; and having placed the premises in the condition in which he found them, to wit: in the possession of the defendant, he then has his plain, adequate, and complete remedy at law, and may accomplish thereby and enjoy the full benefit of all his legal rights as fully and completely as he undertakes to do by this bill.

When he shall have restored the defendant to the position in which he found him, and by his appropriate action recovered

the possession of the premises, his own rights and the rights of the defendant will have been duly passed upon by a court and jury, and he will be under no necessity of invoking the aid of a court of equity; but if he desires to reverse and set aside the judgment of the court of the United States, he must proceed before those tribunals which have the jurisdiction and power to give him the remedy sought.

In my opinion the bill should be dismissed.